IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| **SALLY MARQUARDT,** | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| vs. | ) Civil No. 14-cv-793-CJP[1] |
| | ) |
| **CAROLYN W. COLVIN,** | ) |
| **Acting Commissioner of Social** | ) |
| **Security,** | ) |
| | ) |
| Defendant. | ) |

### MEMORANDUM and ORDER

**PROUD, Magistrate Judge:**

In accordance with 42 U.S.C. § 405(g), plaintiff Sally Marquardt, through counsel, seeks review of the final decision of the Commissioner of Social Security denying her Disability Insurance Benefits (DIB).

### Procedural History

Plaintiff applied for benefits on April 11, 2011, alleging disability beginning on February 16, 2011. (Tr. 10). After holding an evidentiary hearing, ALJ Stuart T. Janney denied the application for benefits in a decision dated May 6, 2013. (Tr. 10-20). The Appeals Council denied review, and the decision of the ALJ became the final agency decision. (Tr. 1). Administrative remedies have been exhausted and a timely complaint was filed in this Court.

### Issues Raised by Plaintiff

Plaintiff raises the following points:

---

[1] This case was referred to the undersigned for final disposition on consent of the parties, pursuant to 28 U.S.C. §636(c).  See, Doc. 7.

1

1. The ALJ improperly formed plaintiff's RFC by finding plaintiff's mental health impairments to be non-severe
2. The ALJ did not properly evaluate plaintiff's credibility.

### Applicable Legal Standards

To qualify for DIB, a claimant must be disabled within the meaning of the applicable statutes. For these purposes, "disabled" means the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." **42 U.S.C. §423(d)(1)(A).**

A "physical or mental impairment" is an impairment resulting from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques. **42 U.S.C. §423(d)(3).** "Substantial gainful activity" is work activity that involves doing significant physical or mental activities, and that is done for pay or profit. **20 C.F.R. §§ 404.1572.**

Social Security regulations set forth a sequential five-step inquiry to determine whether a claimant is disabled. The Seventh Circuit Court of Appeals has explained this process as follows:

> The first step considers whether the applicant is engaging in substantial gainful activity. The second step evaluates whether an alleged physical or mental impairment is severe, medically determinable, and meets a durational requirement. The third step compares the impairment to a list of impairments that are considered conclusively disabling. If the impairment meets or equals one of the listed impairments, then the applicant is considered disabled; if the impairment does not meet or equal a listed impairment, then the evaluation continues. The fourth step

2

> assesses an applicant's residual functional capacity (RFC) and ability to engage in past relevant work. If an applicant can engage in past relevant work, he is not disabled. The fifth step assesses the applicant's RFC, as well as his age, education, and work experience to determine whether the applicant can engage in other work. If the applicant can engage in other work, he is not disabled.

***Weatherbee v. Astrue*, 649 F.3d 565, 568-569 (7th Cir. 2011).**

Stated another way, it must be determined: (1) whether the claimant is presently unemployed; (2) whether the claimant has an impairment or combination of impairments that is serious; (3) whether the impairments meet or equal one of the listed impairments acknowledged to be conclusively disabling; (4) whether the claimant can perform past relevant work; and (5) whether the claimant is capable of performing any work within the economy, given his or her age, education and work experience. **20 C.F.R. §§ 404.1520; *Simila v. Astrue*, 573 F.3d 503, 512-513 (7th Cir. 2009); *Schroeter v. Sullivan*, 977 F.2d 391, 393 (7th Cir. 1992).**

If the answer at steps one and two is "yes," the claimant will automatically be found disabled if he or she suffers from a listed impairment, determined at step three. If the claimant does not have a listed impairment at step three, and cannot perform his or her past work (step four), the burden shifts to the Commissioner at step five to show that the claimant can perform some other job. ***Rhoderick v. Heckler*, 737 F.2d 714, 715 (7th Cir. 1984). See also *Zurawski v. Halter*, 245 F.3d 881, 886 (7th Cir. 2001)**(Under the five-step evaluation, an "affirmative answer leads either to the next step, or, on Steps 3 and 5, to a finding that the claimant is disabled…. If a claimant reaches step 5, the burden shifts to the ALJ to establish that the claimant is

3

capable of performing work in the national economy.").

This Court reviews the Commissioner's decision to ensure that the decision is supported by substantial evidence and that no mistakes of law were made. It is important to recognize that the scope of review is limited. "The findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive. . . ." **42 U.S.C. § 405(g)**. Thus, this Court must determine not whether plaintiff was, in fact, disabled at the relevant time, but whether the ALJ's findings were supported by substantial evidence and whether any errors of law were made. See, ***Books v. Chater*, 91 F.3d 972, 977-78 (7th Cir. 1996)** (citing ***Diaz v. Chater*, 55 F.3d 300, 306 (7th Cir. 1995)**). This Court uses the Supreme Court's definition of substantial evidence, i.e., "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." ***Richardson v. Perales*, 91 S. Ct. 1420, 1427 (1971).**

In reviewing for "substantial evidence," the entire administrative record is taken into consideration, but this Court does <u>not</u> reweigh evidence, resolve conflicts, decide questions of credibility, or substitute its own judgment for that of the ALJ. ***Brewer v. Chater*, 103 F.3d 1384, 1390 (7th Cir. 1997)**. However, while judicial review is deferential, it is not abject; this Court does not act as a rubber stamp for the Commissioner. See, ***Parker v. Astrue*, 597 F.3d 920, 921 (7th Cir. 2010), and cases cited therein.**

### The Decision of the ALJ

4

ALJ Janney followed the five-step analytical framework described above. He determined that plaintiff had not been engaged in substantial gainful activity since her alleged onset date. He found that plaintiff had severe impairments of level three obesity with fibromyalgia, degenerative joint disease, sleep disorder, and psoriasis. (Tr. 12). The ALJ found that plaintiff had the residual functional capacity (RFC) to perform work at the sedentary level with physical limitations. (Tr. 15). Based on the testimony of a vocational expert the ALJ found that plaintiff was able to perform her past relevant work as a sales manager. (Tr. 19-20).

## The Evidentiary Record

The Court has reviewed and considered the entire evidentiary record in formulating this Memorandum and Order. The following summary of the record is directed to the points raised by plaintiff.

1. **Agency Forms**

Plaintiff was born on January 23, 1954 and was fifty-five years old at her alleged onset date. She was insured for DIB through December 31, 2013. (Tr. 141). She was five feet eleven inches tall and weighed two hundred and ninety pounds. (Tr. 145). She had a high school diploma and was a district sales manager for a beauty products chain from 1991 until 2009. (Tr. 146).

According to plaintiff, her fibromyalgia, bipolar disorder, sleep disorder, psoriatic arthritis, psoriasis, hypertension, restless leg syndrome, and reactive airway disease made her unable to work. (Tr. 145). She took several medications and as of 2011 she was taking Betamethasone and Dovonex for

psoriasis, Xanax and Ultram for fibromyalgia, Clonidine and Inderal for high blood pressure, Aciphex and Bentyl for stomach problems, Ventolin for reactive airway disease, Mirapex for restless leg syndrome, Ambien for her sleep disorder, Cymbalta for depression, and Flexeril as a muscle relaxer. (Tr. 148).

Plaintiff submitted function reports in May and September of 2011. (Tr. 181-88, 204-11). Plaintiff stated that pain from fibromyalgia, arthritis, and psoriasis made it difficult to perform tasks that would be necessary for work. Additionally, her bipolar disorder made her moods unpredictable and her sleep patterns irregular. (Tr. 181, 204). Most of her day was spent watching television, taking naps, talking on the phone, and eating. (Tr. 182, 205).

Plaintiff stated she was able to make simple meals like sandwiches and could prepare a complete meal if she had help. (Tr. 183, 206). She went outside three to five times a week and shopped weekly depending on her pain. (Tr. 184, 207). Plaintiff stated that her husband took care of their finances because her bipolar disorder caused her to have a gambling problem. (Tr. 184-85, 207).

She claimed to have trouble lifting, squatting, bending, standing, reaching, walking, sitting, kneeling, climbing stairs, using her hands, remembering, completing tasks, and concentrating. (Tr. 186, 209). Her psoriasis and fibromyalgia caused the limitations she alleged. (Tr. 186, 209).

### 2. Evidentiary Hearing

Plaintiff was represented by an attorney at the evidentiary hearing on April 8, 2013. (Tr. 27). At the time of the hearing she was fifty-nine years old, six feet

tall, and weighed two hundred and ninety-five pounds. (Tr. 30-31). She lived with her husband and was able to drive. (Tr. 31).

Plaintiff worked for Avon as a district manager from 1993 until 2008. (Tr. 33). Her job required her to travel frequently and lift up to fifty pounds. She stopped working because her boss was unhappy with her performance. (Tr. 36).

Plaintiff testified that she had psoriasis on her hands and feet for ten to twelve years and it got progressively worse each year. If she had to frequently use her hands her skin would break open and bleed. (Tr. 37). She tried to avoid water and showering because it made the psoriasis worse. (Tr. 36-38). Plaintiff testified that due to psoriasis she was only able wear tennis shoes and had to wear two pairs of socks to reduce the pain. She testified that she had difficulty using the computer at times due to the psoriasis on her hands. (Tr. 40). Plaintiff used to knit and crochet but the yarn would get caught on her fingers and it became too painful to continue these hobbies. (Tr. 49). She tried using different treatments for her skin condition but nothing helped. (Tr. 41).

Plaintiff stated that she had psoriatic arthritis that caused her to be unable to move her fingers and toes. (Tr. 38-39). She was usually able to hold objects with her hands but would occasionally drop things. (Tr. 39). Plaintiff also testified that she had fibromyalgia for twenty to twenty-five years. (Tr. 41). Most of the pain she experienced from fibromyalgia was located in her back, hips, neck, and shoulders. (Tr. 42). She stated she could not get out of bed some mornings due to the pain from fibromyalgia. (Tr. 37).

7

Plaintiff stated she had several mental health issues. When she was still working for Avon, the pressure to meet company demands caused her anxiety. (Tr. 36-37). She would go back to bed when she felt stressed and when she woke up she still felt anxious. (Tr. 45). Plaintiff testified to having obsessive compulsive disorder and bipolar disorder. (Tr. 46). She stated that she had a gambling problem as a result of these problems and lost a significant amount of money in the past. (Tr. 46, 54-55). When she visited casinos she would stay for five or six hours playing slot machines and video poker. (Tr. 54). Her husband accompanied her when she left her home so that someone was able to monitor her behavior at all times. (Tr. 46).

Plaintiff stated that sitting was the most comfortable position and she could sit for a few hours at a time. (Tr. 51). She could only stand for about five minutes and could walk for a little longer if she was holding on to something for support. (Tr. 52). She saw a doctor in the town where she previously lived to help with her disability application. She indicated that she felt it would be easier for her long term doctor to fill out her forms because he knew her history. (Tr. 56-57).

A vocational expert (VE) also testified. The VE testified that plaintiff's past work as a district manager was classified as medium skilled work as performed. (Tr. 59).

The ALJ asked the VE a hypothetical where she was to assume a person with plaintiff's vocational and educational background, who could perform sedentary work and could frequently handle and finger with her bilateral upper

extremities, and needed to avoid concentrated exposure of respiratory irritants. The VE testified that the individual would be able to perform plaintiff's previous work as a district manager. (Tr. 60). The VE also stated that if plaintiff were limited to frequent contact, as opposed to constant interactions, with coworkers, supervisors, and the general public then her past work would be precluded. (Tr. 62).

### 3. Medical Treatment

In 2008, prior to plaintiff's alleged onset date, she saw her primary care physician Dr. Philip Serna six times. She saw him for problems with psoriasis including infections, headaches, and increased stress. (Tr. 294-306, 322-25).

Plaintiff saw Dr. Serna several times in early 2009 for routine checkups and upper respiratory issues. (Tr. 276-292, 314-15). On Jun 1, 2009 plaintiff presented to Dr. Serna with bilateral foot pain that had been present for almost a month. Plaintiff's feet were bleeding, blistering, and she was barely able to walk. (Tr. 311-13). Later that day plaintiff was admitted to Provena St. Joseph Medical Center for bilateral foot pain and the psoriasis on her feet. (Tr. 367-73). After leaving the hospital, plaintiff returned to Dr. Serna for a follow-up appointment. He noted she had psoriasis but that her conditions had improved. (Tr. 316-18).

Plaintiff saw Dr. Serna several more times in 2009 for follow-up appointments where he noted she had several active problems such as depression, psoriasis, sleep apnea, and hypertension among others. (Tr. 264, 268, 272). Plaintiff continued to see Dr. Serna regularly from 2010 through

9

2013 for psoriasis, stress, osteoporosis, unipolar disorder, obesity, bipolar disorder, obsessive compulsive disorder, insomnia, fibromyalgia, and joint pain. (*Ex.*, Tr. 258, 262, 308, 485, 498).

In April 2011, Dr. Serna wrote a letter describing his understanding of plaintiff's impairments. He stated she was diagnosed with fibromyalgia and took medicine prescribed by her rheumatologist. Additionally, she was diagnosed with mood disorder/unipolar disorder/bipolar disorder and took several medications. From an internal medicine perspective, Dr. Serna stated plaintiff had hypertension, sleep disorder, restless leg syndrome, psoriasis, and reactive airway disease. All of these impairments required different medications for treatment. (Tr. 253).

Plaintiff began seeing George Miguel, M.D. and Joanne Hattendorf, Ed.D., for mental health treatment at Professional Health Associates in 2001. (Tr. 393). After plaintiff's alleged onset date, she received treatment from the doctors at Professional Health Associates forty-eight times. (Tr. 333-349, 441-42, 480-83, 506-11). She was treated for depression, bipolar disorder, dependency, obsessive compulsive disorder, and anxiety. (*Ex.*, Tr. 333-38, 341-44, 348-49, 482). She was prescribed Xanax, Cymbalta, Abilify, lithium, and Equetro. (Tr. 333-34, 337-38, 345, 349, 481, 507). She exhibited a neck tic on multiple occasions and at times had a poor response to medications. (Tr. 442, 481, 510).

### 4. Consultative Examinations

Dr. Adrian Feinerman, M.D., performed a physical consultative examination in July 2011. (Tr. 402-07). On examination, Dr. Feinerman noted that plaintiff had high blood pressure and severe psoriasis on her hands and feet. (Tr. 405). She had 5/5 motor strength and her fine and gross manipulations were normal. She had moderate difficulty squatting and arising. (Tr. 406). His diagnostic impressions were psoriasis, psoriatic arthritis, hypertension, and degenerative joint disease. (Tr. 407).

Dr. Harry Deppe, Ph.D., performed a psychological examination in June 2010. (Tr. 395-99). Dr. Deppe noted that plaintiff's mood was within normal limits but she became somewhat anxious when she spoke about her gambling problems. (Tr. 396-97). Dr. Deppe opined that plaintiff's memory, judgment, and insight were adequate and her abstract reasoning skills were within normal limits. (Tr. 397). His diagnoses were pathological gambling and personality disorder with obsessive compulsive traits. He assigned her a GAF[2] score of 50. (Tr. 398).

### 5. Psychiatric Review Technique

In July 2011, state agency psychologist Howard Tin reviewed plaintiff's medical records and filled out a psychiatric review technique. (Tr. 418-431). He felt plaintiff had a non-severe personality disorder with obsessive-compulsive

---

[2] The GAF is determined on a scale of 1 to 100 and reflects the clinician's judgment of an individual's overall level of functioning, taking into consideration psychological, social, and occupational functioning. Impairment in functioning due to physical or environmental limitations are not considered. American Psychiatric Association, Diagnostic & Statistical Manual of Mental Disorders - Fourth Edition, Text Revision 32-33 (4th ed. 2000); Although the American Psychiatric Association recently discontinued use of the GAF metric, it was still in use during the period plaintiff's examinations occurred.

traits and pathological gambling. (Tr. 425). He opined that plaintiff had mild limitations in her activities of daily living. (Tr. 428).

### 6. RFC Assessment

State agency physician B. Rock Oh, M.D. assessed plaintiff's RFC in July 2011. (Tr. 433-39). He reviewed medical records but did not examine plaintiff. He believed plaintiff could occasionally lift twenty pounds and frequently lift ten pounds. He opined plaintiff could stand or walk for a total of two hours in an eight hour workday, and sit for a total of six hours in an eight hour workday. (Tr. 433). He felt plaintiff should avoid concentrated exposure of fumes, odors, dusts, gases, and poor ventilation. (Tr. 436). Dr. Oh cited Dr. Feinerman's consultative examination for support of these findings. (Tr. 439).

## Analysis

Plaintiff argues that the ALJ erred by failing to include mental health impairments in his RFC assessment and incorrectly evaluated plaintiff's credibility. As plaintiff relies in part on her testimony, the Court will first consider her argument regarding the ALJ's credibility analysis.

It is well-established that the credibility findings of the ALJ are to be accorded deference, particularly in view of the ALJ's opportunity to observe the witness. **Powers v. Apfel, 207 F.3d 431, 435 (7th Cir. 2000).** "Applicants for disability benefits have an incentive to exaggerate their symptoms, and an administrative law judge is free to discount the applicant's testimony on the basis of the other evidence in the case." **Johnson v. Barnhart, 449 F.3d 804, 805 (7th Cir. 2006).**

The ALJ is required to give "specific reasons" for his credibility findings. ***Villano v. Astrue*, 556 F.3d 558, 562 (7th Cir. 2009).** It is not enough just to describe the plaintiff's testimony; the ALJ must analyze the evidence. ***Ibid***. See also, ***Terry v. Astrue*, 580 F.3d 471, 478 (7th Cir. 2009)**(The ALJ "must justify the credibility finding with specific reasons supported by the record."). If the adverse credibility finding is premised on inconsistencies between plaintiff's statements and other evidence in the record, the ALJ must identify and explain those inconsistencies. ***Zurawski v. Halter*, 245 F.3d 881, 887 (7th Cir. 2001).**

SSR 96-7p requires the ALJ to consider a number of factors in assessing the claimant's credibility, including the objective medical evidence, the claimant's daily activities, medication for the relief of pain, and "any other factors concerning the individual's functional limitations and restrictions due to pain or other symptoms." SSR 96-7p, at *3.

Although the ALJ considered a variety of factors in his analysis, his credibility determination cannot be upheld. First, the ALJ selectively chooses portions of the record to look at in order to determine plaintiff was exaggerating certain symptoms. ALJ Janney stated that plaintiff's psoriasis was "only characterized as being mild in severity" and that the evidence did not show the severity of the symptoms she alleged. (Tr. 16). He also stated that plaintiff provided little evidence of seeking acute treatment for flares of psoriasis. (Tr. 17).

The ALJ discusses plaintiff's records briefly and inappropriately downplays the severity of plaintiff's psoriasis. He references one treatment note indicating plaintiff's psoriasis was mild and fails to acknowledge the multiple other locations throughout the record indicating plaintiff's psoriasis was significant and at times severe. For example, as plaintiff points out, at almost all of her doctor's visits her psoriasis was active. (*Ex.*, Tr. 260, 268, 295, 306, 313, 461, 485). In 2009, plaintiff was barely able to walk and was hospitalized for conditions relating to the psoriasis on her feet. (Tr. 313, 467-73). Treatment notes indicate her hands were often very red, cracking, and dry. (*Ex.*, Tr. 393, 402-407, 461, 476). Additionally, state agency physician Dr. Feinerman noted plaintiff had "severe psoriasis on hands and feet." (Tr. 405).

ALJ Janney also noted that plaintiff displayed a frequent tic where her head would turn to the right in a sudden, jerking movement every few minutes during the evidentiary hearing. While plaintiff does not claim to have limitations stemming from her tic, the ALJ associated her frequent tic at the hearing to inconsistencies within the record. He stated that medical evidence on record did not indicate plaintiff had an intense and frequent tic and as a result plaintiff failed to meet her burden of proving she had this symptom. (Tr. 17). However, several portions of the record indicate plaintiff had a noticeable tic of her head for years. For example, both her mental health doctors and Dr. Serna noted she had a tic several times throughout treatment. (Tr. 442, 481, 498). In 2011, plaintiff was interviewed for her initial disability report and the interviewer noted plaintiff had a noticeable tic of her head. (Tr. 142).

In analyzing the evidence, the ALJ is not permitted to "cherry-pick" the evidence, ignoring the parts that conflict with his conclusion. ***Myles v. Astrue*, 582 F.3d 672, 678 (7th Cir. 2009).** While he is not required to mention every piece of evidence, "he must at least minimally discuss a claimant's evidence that contradicts the Commissioner's position." ***Godbey v. Apfel*, 238 F.3d 803, 808 (7th Cir. 2000).** The ALJ here impermissibly "cherry-picks" portions of plaintiff's records to indicate her psoriasis and her head tic were exaggerated when treatment notes indicate otherwise.

ALJ Janney also discusses how plaintiff stated she was limited to sitting for two hours at a time and standing for five minutes yet she also stated she would go to casinos for five or six hours at a time. (Tr. 16). The ALJ infers that the entire time plaintiff was at the casino she was sitting and therefore this contradicts her testimony that she could only sit for a few hours at time. However, it is entirely possible that plaintiff took breaks within her time at the casino to stand up and walk around. The ALJ failed to ask follow up questions regarding plaintiff's time at the casino and instead drew his own inferences to determine she was being untruthful about the amount of time she was able to sit. This is error.

Plaintiff stated that she continued to have anxiety even after she stopped working but knowing she did not have to go to work helped her stress levels. The ALJ felt these statements were inconsistent and therefore undermined plaintiff's credibility. (Tr. 17). However, plaintiff explains that these two statements are not necessarily contradictory. Records indicate that losing her

15

job increased her anxiety and that she continued to have anxiety while she was unemployed. (Tr. 297). At the same time, many days she does not feel like getting out of bed at all and the lack of pressure to go to work makes it easier on her stress levels. (Tr. 45-6). The ALJ is attempting to find a contradiction where one does not necessarily exist and fails to adequately build the requisite "logical bridge" to his conclusions. **Simila v. Astrue, 573 F.3d 503, 516 (7th Cir. 2009).**

Finally, the ALJ stated that plaintiff's claims that her pain medications made her drowsy were not substantiated by the record and this inconsistency harmed plaintiff's credibility as well. (Tr. 17). The ALJ asked plaintiff if she experienced side effects related to the medications she takes and she responded that the hydrocodone made her tired. She stated she only took it when she went to sleep and that her other medications caused no problems. (Tr. 47). The inconsistency ALJ Janney perceived does not necessarily exist. Plaintiff did not claim to be negatively affected by the side effects of her medications and did not state her medications were the cause of any problems. Therefore, it would follow that she did not complain to her doctors about one of the most common side effects of the medication because it did not bother her.[3]

The ALJ was not required to believe all of plaintiff's testimony or complaints, but he was required to have logical and evidentiary bases as to why plaintiff's credibility was discounted. ALJ Janney simply failed to provide

---

[3] See, *ex.,* http://harvarddapa.org/hydrocodone;
http://www.nlm.nih.gov/medlineplus/druginfo/meds/a601006.html;
https://www.stjude.org/SJFile/hydrocodone_acetaminophen.pdf; all explaining that a common side effect of Hydrocodone is drowsiness.

sufficient reasoning here.  "If a decision 'lacks evidentiary support or is so poorly articulated as to prevent meaningful review,' a remand is required." ***Kastner v. Astrue*, 697 F.3d 642, 646 (7th Cir. 2012), citing *Steele v. Barnhart*, 290 F.3d 936, 940 (7th Cir. 2002).**

It is not necessary to address plaintiff's other point at this time. The Court wishes to stress that this Memorandum and Order should not be construed as an indication that the Court believes that plaintiff is disabled or that he should be awarded benefits.  On the contrary, the Court has not formed any opinions in that regard, and leaves those issues to be determined by the Commissioner after further proceedings.

## Conclusion

Plaintiff's motion for summary judgment is granted. The Commissioner's final decision denying Sally Marquardt's application for social security disability benefits is **REVERSED and REMANDED** to the Commissioner for rehearing and reconsideration of the evidence, pursuant to sentence <u>four</u> of **42 U.S.C. §405(g).**

The Clerk of Court is directed to enter judgment in favor of plaintiff.

**IT IS SO ORDERED.**


**DATE:  June 2, 2015.**


<u>**s/ Clifford J. Proud**</u>

**CLIFFORD J. PROUD**

17

**UNITED STATES MAGISTRATE JUDGE**